IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JACK A. STARK, | ) | CASE NO.: _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT AND** |
| | ) | **DEMAND FOR JURY TRIAL** |
| CITY OF OMAHA, NEBRASKA; | ) | |
| OMAHA POLICE CHIEF TODD | ) | |
| SCHMADERER, individually and in his | ) | |
| official capacity, NICOLAS YANEZ, | ) | |
| individually and in his official capacity; | ) | |
| WILLIE J. MILLER, individually; | ) | |
| DOUGLAS H. ANDERS, individually, | ) | |
| and JOHN or JANE DOES 1-5, real | ) | |
| names unknown. individually and in | ) | |
| their official capacities. | ) | |
| | | |
| Defendants. | | |

COMES NOW Plaintiff, Jack A. Stark, by and through his counsel of record, for his causes of actions against the defendants, is informed and believes, and upon such information and belief, states and alleges as follows:

**INTRODUCTION**

1.      This lawsuit is brought pursuant to the provisions of 42 U.S.C. § 1983 for infringement of Jack A. Stark's ("Dr. Stark") civil rights guaranteed by the First, Fourth, and Fourteenth Amendments of the United States Constitution and other applicable law. Dr. Stark seeks relief for injuries sustained after being subjected to an unconstitutionally insufficient investigation, falsely arrested, maliciously prosecuted, and subsequently acquitted for one count of witness tampering in the Nebraska District Court, Douglas County.

2.      Dr. Jack Stark was wrongly arrested and prosecuted for witness tampering following a spurious investigation led by the Omaha Police Department

1

("OPD") based upon obviously false statements by an individual, Willie Miller ("Miller"). Though a jury of his peers found Dr. Stark innocent of these charges in January 2023, he has suffered extensive harm at the hands of Miller, the OPD, and others abusing the criminal justice system.  Regardless of his acquittal at trial, Dr. Stark should never have been charged with a single crime. The entire ordeal was a gross violation of Dr. Stark's Constitutional rights. This lawsuit seeks accountability for those responsible for Dr. Stark's malicious prosecution.

3.      This case arises out of Dr. Stark's efforts to *assist* law enforcement with their prosecution of Doug Anders ("Anders") for sexual assault in the first degree. In 2020, Dr. Stark was called upon as a witness for the Douglas County Attorney's Office to provide testimony against Anders.

4.      Miller was listed by the defense as a character witness for his friend, Anders. At this time, however, Miller had not yet been subpoenaed to testify at Anders' trial. During a ten-minute unrecorded phone call, Miller asked Dr. Stark for advice about the upcoming Anders trial.. In a text message, Dr. Stark told Miller "do what you want."

5.      Days before the trial was set to begin in August 2020, Miller was urged by Anders and others to contact OPD regarding Miller's contact with Dr. Stark. Even though Miller was under no legal obligation to appear in court, Miller reported to the police that Dr. Stark told him not to "show up" at the Anders trial. Miller went so far as to claim that Dr. Stark threatened to "ruin" Miller if he did show up for the Anders trial.

6.      But nothing Miller alleged constituted a crime. To the contrary, everything Miller asserted would have been protected speech under the First Amendment.

7.      On October 30, 2020, the OPD downloaded every text message stored in Miller's cell phone but failed to review them or attempt to corroborate Miller's story. Had the OPD investigated Miller's actions, they would have discovered that Miller, in coordination with Anders and others, was attempting to keep Dr. Stark from testifying against Anders.

8.      Dr. Stark appeared in court to testify at Anders' trial, but the Douglas County Attorney did not call him as a witness. However, Miller did testify for Anders as a character witness. At trial, Miller was confronted with evidence that his testimony was false, and Anders was ultimately convicted of first-degree sexual assault. After the State successfully convicted Anders, OPD moved forward with Miller's false witness tampering allegations against Dr. Stark.

9.      Officer Nicolas Yanez ("Yanez"), the lead investigator for OPD, did not review the downloaded text messages from Miller's phone. Importantly, Yanez neither attended the Anders trial nor reviewed the trial transcript. Had he done either, Yanez would have known that Miller's credibility was seriously undermined when the prosecution impeached his testimony. Instead, **six months** after Anders' conviction, Yanez applied for an arrest warrant and filed an affidavit to arrest Dr. Stark for witness tampering (the "Affidavit"). There was never probable cause for this arrest, however, because the Affidavit was riddled with false statements and omitted material facts.

10.     At no point did Yanez interview Dr. Stark as part of the investigation. Yanez ignored key evidence in his possession to wrongly arrest Dr. Stark for witness tampering. These actions violated and continued to violate Dr. Stark's Constitutional rights until January 20, 2023, when Dr. Stark was acquitted by a jury of his peers after only twenty-seven (27) minutes of deliberation.

11.     The malicious prosecution of Dr. Stark for witness tampering*, which occurred after the Douglas County Attorney convicted Anders at trial*, was unprecedented in several ways:

   a.   Dr. Stark was a prosecution witness; witness tampering is an offense committed by criminal defendants and their agents;

   b.   The underlying criminal case commenced and was completed to jury verdict without any obstruction of justice;

   c.   The alleged "tampering victim" testified at length for the defendant at that underlying proceeding;

d.  The alleged "tampering victim" was not a factual or material witness and had no relevant knowledge of the facts at issue;

e.  The criminal defendant was convicted despite the "tampering victim's" testimony; and,

f.  A full six months passed after the criminal proceeding was complete, and the defendant was convicted before Dr. Stark was arrested and charged.

12.    As a result of his malicious prosecution, Dr. Stark suffered substantial monetary damages, degradation, humiliation, and loss of reputation and esteem.

## THE PARTIES

13.    Plaintiff, Dr. Stark, is an elected member of the University of Nebraska Board of Regents, a former Sports Psychologist, and a resident of Omaha, Douglas County, Nebraska. For decades, Dr. Stark volunteered his time to mentor athletes, especially former athletes from the University of Nebraska.

14.    Defendant, City of Omaha, is a municipality incorporated in the State of Nebraska. It is responsible for the Constitutional violations caused by its officers, agents, and employees acting according to its customs and policy. The City of Omaha's principal place of business is in Douglas County, Nebraska.

15.    Defendant Todd Schmaderer was at all material times the Chief of Police and chief policymaker for the Omaha Police Department.

16.    Defendant Nicolas Yanez was at all material times a police officer with the Omaha Police Department with badge #1506.

17.    Defendant Willie J. Miller is a resident of Sarpy County, Nebraska.

18.    Defendant Douglas H. Anders, is a resident of the Tecumseh State Correctional Institution, Johnson County, Nebraska.

19.    Plaintiff also brings this civil action against Defendants John Does 1-5, whose true names and identities are currently unknown to Plaintiff. Plaintiff believes the identity of the anonymous defendants will be revealed in the course of

4

Discovery, and Plaintiff will move for leave to amend this pleading to allege their true names and identities when ascertained.

## JURISDICTION AND VENUE

20. This Court has subject-matter jurisdiction over this lawsuit's 42 U.S.C. § 1983 claims under 28 U.S.C. §§ 1331 and 1343.

21. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the actions and/or events giving rise to the state law claims are the same as those giving rise to the § 1983 claims.

22. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1402(b) because the actions and/or events giving rise to this lawsuit occurred in Nebraska.

## FACTUAL ALLEGATIONS

**A.    Summary of the case.**

23. This case involves a ten-minute phone call that took place on the evening of August 14, 2020, between Dr. Stark and Miller.

24. Miller was having personal problems and had asked Dr. Stark to call him to give him some advice.

25. Neither Miller nor Dr. Stark recorded the call, and no other party was present to listen to the conversation.

26. One week later, Miller visited his friend Anders, who was awaiting trial on charges of sexual assault in the first degree.

27. During that meeting, Anders learned for the first time that Dr. Stark was going to testify against him in his upcoming trial. Specifically, Dr. Stark intended to testify on behalf of the sexual abuse victim in the case of *State v. Anders*.

28. Anders and Miller engaged in a plan designed to have Dr. Stark arrested before Anders went on trial.

29. OPD filed Miller's allegations in a police report, and took no action.

30.     But, at the behest of Anders and others, Miller continued to press the issue by calling Central Headquarters several times a week. Meanwhile, other individuals called members of the Omaha City Council daily.

31.     Eventually, Yanez was assigned the task of investigating Miller's complaints.

32.     But Yanez willfully and recklessly engaged in an unconstitutionally substandard investigation.

33.     Yanez took Miller's statement and copied all the data on Miller's phone, including text messages.

34.     All of Miller's text messages were loaded into a computer software program, which allows the police to run word searches and quickly locate cell phone data. Despite this, Yanez never reviewed these text messages or otherwise searched through Miller's cell phone.

35.     Had Yanez taken these simple, routine investigatory steps, OPD would have seen clear evidence that Miller was engaged in a conspiracy to tamper with Dr. Stark's upcoming testimony at the Anders trial.

36.     Yanez also never interviewed key witnesses to corroborate Miller's allegations.

37.     Nor did Yanez even attempt to question Dr. Stark about the August 14, 2020 phone call.

38.     Even though the purpose of a witness tampering investigation is safeguard the integrity of court proceedings, Yanez **suspended** his investigation pending the completion of the underlying *State v. Anders* trial.

39.     Although Yanez was aware that Miller and Dr. Stark were scheduled to testify under oath at the Anders trial, Yanez did not observe or attend any part of the trial.

40.     Yanez also never read the *State v. Anders* trial transcript.

41.     Yanez filed an affidavit seeking an arrest warrant that failed to establish probable cause as a matter of law and was materially false.

42.     Had Yanez looked at the text messages, he would have known that Miller's statements to the police were false.

43.     Had Yanez attended the Anders trial, he would have known Miller was not credible.

44.     Had Yanez read the Anders trial transcript, he would have known his key witness was unreliable.

45.     Had Yanez refrained from filing a false and misleading affidavit, Dr. Stark would not have been arrested.

46.     Had Yanez refrained from arresting Dr. Stark, Dr. Stark would not have been maliciously prosecuted.

47.     Because of Miller's and Yanez's unlawful acts, Dr. Stark had to defend himself before a jury of his peers.

48.     The jury found him "not guilty" with less than twenty-seven (27) minutes of deliberation.

49.     Yanez had possession of all the evidence proving Dr. Stark's innocence for over *ten months* when he filed his affidavit seeking an arrest warrant.

50.     As a result of Miller's and Yanez's unlawful acts and the acts of persons still unknown, Dr. Stark has and continues to suffer substantial damages.

**B.     The criminal case against Anders involved his sexual assault of a minor.**

51.     In November 2018, Anders was arrested and charged with Sexual Assault in the First Degree. The assaults occurred over six years, beginning when Anders' sexual assault victim (the "Sexual Assault Victim") was just 15 years old. The assaults started as digital penetration and progressed to penile penetration.

52.     Anders owned and operated a gym in Omaha, where he assisted people in rehabilitative workouts.

53.     The Sexual Assault Victim attended the gym, and Anders coached her to become an Olympic weightlifter.

54.     Anders told Sexual Assault Victim that he needed to penetrate her to relieve her pelvic pain and help her train more efficiently.

7

55.     Anders lied and manipulated the Sexual Assault Victim to perpetrate his crime of Sexual Assault in the First Degree.

56.     The Sexual Assault Victim described the gym's culture as "Cult-like."

57.     In 2012, Anders was first convicted of a felony and crime of deceit when he pled guilty to making false statements to the Bureau of Alcohol, Tobacco, Firearms, and Explosives in violation of 18 U.S.C. § 924(a)(1)(A) and 18 U.S.C. § 2.

58.     Anders' Sexual Assault trial was initially scheduled to begin on August 24, 2020.

59.     The trial was continued until November 2, 2020, and was eventually tried in February 2021.

60.     Fourteen members of Anders' gym testified as character witnesses on his behalf, including Miller.

61.     In contrast, Dr. Stark was a witness for the State of Nebraska. He planned to testify in support of the Sexual Assault Victim whom he had mentored as an aspiring Olympic athlete.

62.     Despite Anders' fourteen character witnesses, he was convicted and sentenced to 25-30 years for sexual assault.

**C.     Willie Miller's personal problems and credibility issues.**

63.     Miller's history and characteristics show that he is not a reliable witness.

64.     Miller played football for the University of Nebraska from 1996-2000 as a fullback.

65.     Miller and Dr. Stark met during that time but did not develop a close relationship, as Dr. Stark spent most of his time mentoring the quarterbacks and kickers with psychological blocks to performance.

66.     After college, Miller suffered from severe mental health problems and drug addiction issues.

67.     Miller spent about a decade suffering from bipolar disorder while simultaneously abusing Oxycodone and alcohol.

68.     Miller claims he took 80mg of Oxy and drank a case of beer every day.

8

69.     Miller had an extensive criminal history, including felony criminal mischief, disorderly conduct, and obstructing a police officer prior to his claims of witness tampering.

70.     Miller began hanging out at Anders' gym sometime in the early 2000s and continued until he moved to Mississippi in 2014 or 2015. Miller never paid Anders for going to the gym, and Anders never billed him. After returning from Mississippi, Miller continued to frequent Anders' gym until Anders' conviction.

71.     Anders took Miller "under his wing" and kept him close.

72.     In 2018, Dr. Stark reached out to Miller to invite him to a dinner in honor of Frank Solich because Miller was a running back and Solich was a running back coach.

73.     Shortly thereafter, Miller drank himself into a coma and requested assistance from Dr. Stark.

74.     The Nebraska Greats Foundation paid for Miller to go to drug rehab and paid for him to have back surgery, which eased his dependence on pain medication.

75.     After returning from rehab, Miller attended the Solich dinner. While there, Miller introduced himself to the now former Athletic Director for Creighton, and they began a mentoring relationship of their own.

76.     Dr. Stark also began mentoring Miller after his return from rehab and encouraged him to return to school. Miller started attending Metropolitan Community College to complete the prerequisites required for the Accelerated Nursing Program at Creighton University.

77.     Miller and Dr. Stark met in person on only two occasions between the years 2000 and 2023. Their mentoring relationship began in 2018 and was primarily via text messages and the occasional phone call.

78.     Dr. Stark helped Miller by giving him advice and counsel. He wrote a recommendation letter for his application to Creighton and asked Coach Tom Osborne to write a letter of recommendation as well.

79.     At no time did Dr. Stark have any professional relationship with Miller or provide psychological services. Dr. Stark had left private practice before even meeting Miller.

80.     In July 2020, Miller was admitted to the Accelerated Nursing Program at Creighton University, which was to begin on August 17, 2020.

**D.     Miller suffered increasing stress leading up to the beginning of school.**

81.     Over the summer of 2020, Miller became increasingly anxious about his ability to perform in Creighton's highly demanding one-year nursing program.

82.     In July 2020, Dr. Stark asked Miller if he would like to speak at an event hosted by the Bellevue Chamber of Commerce because Miller was an athlete from Bellevue. Miller agreed. The event was scheduled for September 17, 2020.

83.     Miller was anxious about missing class to testify at the upcoming Anders trial, which was set to begin during the second week of school on August 24, 2020.

84.     On August 13, 2020, Miller texted Dr. Stark, "Jack I need your help with something…can you please give me a call when you get a chance…"

85.     On the afternoon of August 13, 2020, Dr. Stark called Miller and left him a voicemail checking in on him and seeing what he needed help with.

86.     That same day, August 13, 2020, Dr. Stark met with the Douglas County Attorney's prosecuting attorney to prepare for his testimony against Anders. The prosecutor asked Dr. Stark if he knew any witnesses listed by the defense to testify on Ander's behalf. Miller's name was on the list.

87.     Of course, Dr. Stark knew Miller.

88.     A few hours later, Dr. Stark followed up with a text message notifying Miller he was listed as a character witness for Anders: "Just an FYI. Not sure you know it but your name is listed as a character witness for a trial in two weeks on DOUG Anders. Do what you want but I will be testifying against him in the strongest language and if you want to know more let me know. Doubt if you are involved but just letting you know. Jack"

89.     Also, on August 13, 2020, Miller met with his fellow classmates for the Accelerated Nursing Program and tweeted a group photograph..

90.     On the evening of August 13, 2020, after seeing the photograph, Miller's fiancé suddenly kicked him out of his house. Miller had to grab his clothes and leave, and he did not sleep at all that night.

91.     At 5:24 a.m., August 14, 2020, Miller began texting friends to find a new place to live.

92.     Miller explained to his friends and confidants that "this came out of nowhere" and that he did not have a place to live, and his only possessions were his clothes. Miller said he was in a "desperate situation." Miller asked Dr. Stark for help because he had bad credit and no furniture, and school was scheduled to start in a few days.

**E.     Miller's request on August 14, 2020 to speak with Dr. Stark and get advice.**

93.     Shortly before 2 p.m. on August 14, 2020, Miller texted Dr. Stark, "Hey Jack I have some stuff going on at home that's pretty tough right now…I am sorry it has taken me a minute to get back to you…"

94.     At 5:37 PM on August 14, 2020, Dr. Stark and Miller spoke over the phone for just under ten minutes. Neither party recorded the call, and no one else was listening.

95.     During the call, Miller and Dr. Stark spoke about three topics: 1) Miller getting kicked out of his home and his efforts to find a new place to live, 2) Miller's stress about the beginning of school on August 17th, and 3) Miller's worries about missing class to testify on Ander's behalf at his August 24th trial.

96.     Dr. Stark gave Miller advice like he would any mentee who called him with stress and concerns.

97.     Dr. Stark told Miller he could help him find a tutor to assist with school, and he told him to talk to Anders' attorney to see if they could work anything out to avoid over-taxing his school schedule.

98.     August 2020 was during the height of the COVID-19 pandemic, and using Zoom had greatly increased flexibility throughout society, including trials.

99.     Miller spent August 15th and 16th finding, moving into, and furnishing a new apartment rather than doing the assigned pre-term schoolwork.

100.    Miller stated he was "behind the 8 ball" in preparation for the beginning of the accelerated nursing program. He said that he was "already behind" before school even started.

101.    On August 17, 2020, rather than watch the five hours of assigned lectures for the first day of school, Miller spent the day loading furniture into his new apartment.

102.    On August 18, 2020, Miller was struggling to catch up on school work, failed a quiz at school, and learned for the first time that two quizzes were due during class the next day when he thought they were due later.

**F.     Anders became furious when he learned from Miller that Dr. Stark would testify for the victim and prosecution.**

103.    Between August 13, 2020, and August 18, 2020, Miller sent and received over 400 text messages, and not a single one of them mentions Dr. Stark or the August 14th phone call.

104.    The vast majority of the messages relate to Miller's breakup, housing, and schoolwork.

105.    Even though Miller would later claim that Dr. Stark threatened to "ruin" Miller during their August 14, 2020 phone call, Miller texted his new address to Dr. Stark just two day later on August 16, 2020.

106.    The next day, on August 17, 2020, at some time after 8:35 p.m., Miller spoke with Anders over the phone.

107.    During this conversation, it was revealed to Anders that Dr. Stark planned to testify on behalf of the prosecution and the Sexual Assault Victim.

108.    Anders had listed Dr. Stark as a potential witness for his own defense and became furious when he realized Dr. Stark intended to testify against him.

109.   That night, around 11 p.m., Anders called his criminal defense attorney ("Anders' Attorney") on the phone.

110.   Anders' Attorney dictated a memo to himself regarding the call in which he stated Anders "was quite excited," and he had a hard time getting Anders off the phone because he was so agitated.

111.   Anders told his attorney that Dr. Stark threatened Miller with retaliation if he testified on Anders' behalf.

112.   The following day, on August 18, 2020, Anders' Attorney spoke with Dr. Stark on the phone for approximately 22 minutes. Anders' Attorney documented having a long discussion with Dr. Stark about Dr. Stark's expected testimony, why Dr. Stark believed Anders was guilty, and why he was willing to testify for the prosecution.

113.   Anders' Attorney's contemporaneously dictated memo did not mention Miller or any claims of witness tampering.

114.   On Wednesday, August 19, 2020, after three days of being totally overwhelmed with the one-year accelerated nursing program, Miller visited Anders at the gym, and the two of them called Anders' Attorney together.

**G.   Miller misrepresented the content of the August 14th phone call.**

115.   On August 19, 2020, while Miller was physically present with Anders at the gym, Miller made false statements to Anders' Attorney about the August 14th phone call.

116.   Miller told Anders' Attorney that Dr. Stark threatened him with professional retaliation if he testified on behalf of Anders. Miller said Dr. Stark threatened to ruin Miller's life because Dr. Stark was going to be elected to serve on the University of Nebraska Board of Regents.

117.   While at the gym with Anders on August 19th, Anders and others told Miller to report his story to the administrators of the Creighton Nursing Program.

13

118.   Just a little later, at 7:55 p.m., August 19th, Miller sent an email to administrators at the Creighton University Nursing Program, blaming his school problems on Dr. Stark's purported threat, and later forwarded that email to Anders.

119.   Miller's email to the Creighton administrators contained numerous assertions that undermined Miller's credibility:

•   Miller told them he was threatened by a "member of the Creighton Bluejay family who is in a position of authority."

•   Miller told them he was a "key witness for this significant trial."

•   Miller told them Dr. Stark threatened his "future at Creighton along with any other success he might have in the State of Nebraska as he plans to be elected to the Nebraska Board of Regents."

•   Miller boasted that the trial involves "several prominent members of Nebraska. Some that are Creighton Alumni and staff."

•   Miller stated he is not "trying to look to get out of anything" but admitted he was having a hard time in school and blamed that on Dr. Stark.

120.   In reality, however, Dr. Stark has never had a position of authority at Creighton University. Instead, Dr. Stark volunteered with the Athletic Department and assisted college athletes with performance issues. Miller was not a college athlete at Creighton and would have had no contact with Dr. Stark.

121.   Miller was never a key witness for the Anders trial. He was merely a character witness. Miller was also incapable of knowing any material facts about the case against Anders because Miller was not even in the State of Nebraska during the relevant time periods..

122.   Dr. Stark did not threaten Miller.

123.   The University of Nebraska Board of Regents has no role in the operation of Creighton University or the numerous employers of nurses in the State of Nebraska.

124.   Miller's August 19th email to Creighton about his false accusations against Dr. Stark is inconsistent with Miller's other interactions with Creighton. Specifically, after the August 14th phone call (but before Miller emailed Creighton),

14

Miller met with his academic advisor and a professor. The purpose of this meeting was for Miller to seek help with his academic performance. But Miller did not mention the bogus witness tampering allegations. Instead, Miller only reported his accusations to Creighton after Miller's meeting with Anders.

125.   On or about August 22, 2023, Miller withdrew from classes at Creighton and later also withdrew from the Bellevue Chamber of Commerce speaking event.

126.   After dropping out of school, Miller was unemployed and spent his time at Anders' gym. At this time, Miller and others tried to push for the arrest of Dr. Stark with the intention of keeping Dr. Stark off the witness stand at the Anders trial.

**H.   Anders, Miller, and others conspired to tamper with Dr. Stark.**

127.   Just thirty minutes after sending his August 19th email to the Creighton University Nursing Program, Miller texted Anders: "Please make [our mutual contacts] aware that I sent that email in, and please have those guys make sure [the former Athletic Director] knows what is going on right now!!!"

128.   Anders replied three minutes later, "I will and reinforce tomorrow. I am sure [our mutual contacts] started things to night."

129.   Anders texted Miller, "Willie it argent that you e-mail copy of your e-mail to Creighton and list of people you sent it to [my Attorney] ASAP." at 10:23 a.m. August 20, 2020.

130.   At 10:32 a.m., Miller stepped out of class and forwarded his email to Anders' Attorney.

131.   At 10:34 a.m., Anders texted Miller, "I realize you in class but please get that to [my Attorney] he big time in your corner."

132.   Anders sent Miller a series of texts throughout the day on August 20, 2020, suggesting he forward his email to a local construction executive, contact an another attorney to make his lies more legitimate, and suggesting that having Anders' Attorney complain to the Douglas County District Court would protect

Miller. But Anders primary objective was to exclude Dr. Stark's testimony from the *State v. Anders* trial, which was **just four days away**.

133.   Anders, who is named as "Dougal" in Miller's phone contacts, continued to press the issue and texted Miller that his defense Attorney was "very fired up" and that if Miller retained an attorney, "that will keep it real real" and that "[My Attorney] is going to push this":



From: ▮▮▮▮▮ **Dougal**
To: ▮▮▮▮▮▮▮▮▮▮ (owner)

Ok thanks hes very fired up . A claim to the court will bring everything your way ss far as protection and legitimacy

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮▮▮▮ | | | |

**Status: Read**
**Read: 8/20/2020 11:22:31 AM(UTC-5)**

8/20/2020 11:22:02 AM(UTC-5)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x232DB2F (Table: message, handle, Size: 58933248 bytes)

From: ▮▮▮▮▮ **Dougal**
To: ▮▮▮▮▮▮▮▮▮ (owner)

Note. Make sure you talk to ▮▮▮▮▮▮ asap before you start talk to anyone at Creighton. Yhat very very important they know your working with and attorney.  That will keep it real real

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮▮▮▮ | | | |

**Status: Read**
**Read: 8/20/2020 2:41:26 PM(UTC-5)**

8/20/2020 2:35:05 PM(UTC-5)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x2331A21 (Table: message, handle, Size: 58933248 bytes)



Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x2333F7D (Table: message, handle, Size: 58933248 bytes)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x233587F (Table: message, handle, Size: 58933248 bytes)

134.   On August 21, 2020, Anders continued his campaign to have Miller make false accusations against Dr. Stark, including coaxing Miller to pursue "legal" action against Dr. Stark at Creighton and instructing him to "Make sure send everything to [my Attorney] and Keep him up to speed on his consistency."

135. Meanwhile, on August 21, 2020, on the Court's own motion, the Anders trial was continued, and a scheduling hearing was set for September 1, 2020.

136. On August 23, 2020, Miller coordinated with Anders about holding a press conference at Creighton to take his false accusations to the press.

137. That same day, Miller complained to Anders that he had not yet heard back from KETV about doing an exclusive, and Anders sent Miller the contact information for a former investigative journalist, a personal friend of a former City Councilman, and the name of a field organizer with the Nebraska Democratic Party.

138. On August 26, 2020, Anders texted Miller to tell him to talk with Anders' Attorney and "ask for a letter from him confirming his and prosecutor conclusion."

139. On August 27, 2020, Anders texted Miller to encourage him to allow a former attorney from a Fortune 500 Company to introduce him to people because he would lend legitimacy to Miller's claims.

140. At 11:16 a.m., Miller told Anders he is doing everything Anders wants him to do and that Anders should be badgering the others similarly:



Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x23DAF84 (Table: message, handle, Size: 58933248 bytes)

141. Later that day, Anders told Miller to contact a State Senator and provided him with the Senator's home phone number. Then Anders explained that

his mutual contact would talk to Anders' Attorney, Tom Osborn, and Dr. Stark's opponent in the Board of Regents election:



Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x23E7F7C (Table: message, handle, Size: 58933248 bytes)

142.    On August 28, 2020, Miller attempted to get on a local sports podcast to spread his false allegations.

143.    Between August 19, 2020 and August 29, 2020, Miller and Anders exchanged approximately 160 text messages. Most of the texts dealt directly with Anders' and Miller's false accusations against Dr. Stark.

144.    Again, at no point prior to Dr. Stark's arrest, did Yanez ever review these text messages. Had he done so, OPD would have known that Anders, a criminal defendant, was using Miller's false statements to cause the arrest of Dr. Stark, a prosecution witness, in an effort to undermine the evidence against Anders at his criminal trial.

**I.    Miller filed a false police complaint while at Anders' Attorney's office.**

145.    On August 29, 2020, three days before the Anders trial rescheduling hearing on September 1st, Miller visited Anders' Attorney at his office.

146.    During that visit, Anders' Attorney called 911 to report a case of witness tampering.

147.    Officer Joe Eischeid of the OPD reported to Anders' Attorney's office and spoke with both Miller and Anders' Attorney.

148.    Miller told Officer Eischeid he was a character witness for the upcoming Anders trial.

149.    Miller told Officer Eischeid that Dr. Stark had gotten him enrolled in Creighton's nursing program and showed him the August 13th text message in which Dr. Stark told Miller to "Do what you want."

150.    Miller told Officer Eischeid about his phone call with Dr. Stark, although he did not correctly identify the date and time of the call.

151.    Miller told Officer Eischeid that Dr. Stark threatened to "ruin everything for him" and could do so because he would be on the Board of Regents.

152.    Anders' Attorney stated to Officer Eischeid that Dr. Stark had originally been a witness for Anders but was now a witness for the prosecution. Any reasonable police officer in Eischeid's position would have recognized that Anders had a motive to tamper with Dr. Stark's testimony and would, therefore, be highly suspicious of Miller's allegations.

**J.    Miller and others continued to push for the arrest of Dr. Stark before Anders' November trial date.**

153.    On September 1, 2020, the Anders trial was continued to November 2, 2020.

154.    On September 3, 2020, Anders texted Miller directing him to file a complaint with the Nebraska Department of Health and Human Services against Dr. Stark, as it would "go a long ways in upcoming litigations."

20



155.   On September 9, 2020, Miller reported that a City Councilman agreed to contact the county prosecutors to ensure "this is not sat on or dismissed."

156.   On September 10, 2020, Miller sent a letter to Nebraska DHHS in an attempt to have Dr. Stark's psychological license revoked.

157.   In his letter to DHHS, Miller's made additional false statements, including his that Dr. Stark was his personal psychologist for many years and that Dr. Stark counseled him through a suicide attempt even though Dr. Stark never treated Miller in any professional capacity.

158.   In fact, Dr. Stark had not seen any patients in a clinical capacity since 1997.

159.   Attached to his DHHS letter, Miller included a copy of the letter he sent to Creighton, the August 13th text message from Dr. Stark telling him to "Do what you want," and Anders' Attorney's business card.

160.   Miller immediately forwarded his DHHS letter to Anders and others.

161.   Again, this key information, which shows Miller's credibility problems and Anders' involvement, was in Yanez's possession at the time he sought an arrest warrant for Dr. Stark. Had Yanez even glanced at the letter, OPD would have known that Miller was, at a minimum, an unreliable witness.

162.    On September 18, 2020, Miller met with an investigative reporter to try and convince him to run a story about Dr. Stark. Miller and Anders believed press coverage would pressure the police to arrest and charge Dr. Stark.

163.    On September 18, 2020, Miller received a letter from the Nebraska DHHS summarily declining to investigate his complaint due to "insufficient evidence."

164.    Miller believed that if he had a lawyer representing him, the lawyer could push the prosecutors and police to arrest Dr. Stark before Anders' trial date. And, if Dr. Stark were arrested, he would not be able to testify Anders.



165.    On September 21, 2020, the investigative reporter told Miller he could not run any story without a police report. In an effort to get legitimizing press coverage, Miller began trying to acquire the police report from his initial contact with Officer Eischeid.

166.    On September 23, 2020, Miller attempted to retrieve a copy of the August 29th police report.

167.    After failing to be able to retrieve the police report, Miller began personally campaigning for the police to arrest and charge Dr. Stark.

168.    Miller called OPD no less than seven times during October 2020 to compel them to arrest Dr. Stark before the Anders trial began on November 2nd.

169.   Miller surreptitiously recorded his calls with OPD.

170.   On October 7, 2020, Miller spoke to Detective Liebe at OPD for over twenty minutes. During the call, he repeated his false claims about Dr. Stark and pressured Liebe to investigate.

171.   On October 19, 2020, Miller spoke with Detective Liebe again, and she informed him that the County Prosecutor's office was "at a loss" because "this doesn't come up that often."

172.   On October 19, 2020, Miller prepared a timeline detailing his efforts to convince the police to charge and arrest Dr. Stark.

173.   On October 22, 2020, Yanez called and scheduled an interview with Miller for Monday, October 26, 2020.

174.   Miller immediately texted his mutual contact with the City Councilman's office, to inform him of the interview and his delight that his false complaint would be investigated.

175.   His contact responded, "Good!!! I'm calling [the City Councilman's office each day."

176.   Miller thanked him for his assistance and declared that their calls were the driving force compelling the police to investigate his false claims:



From: ███████████████████ (owner)
Wow... well again I can't thank you enough for your support during this deal because I am sure that your calls in addition to Liebe letting them know I am contacting her at least once a week is what is causing them to unbury this deal...
Status: Sent
Delivered: 10/22/2020 3:42:17 PM(UTC-5)
10/22/2020 3:42:17 PM(UTC-5)

177.   In October 2020, Miller developed the idea that prosecuting this false charge against Dr. Stark would help him get a pardon for his felony:



**K.     Yanez interviewed Miller; no reasonable officer would have believed his false statements.**

178.     OPD maintains an official written policy regarding Criminal Investigations, which was established by Defendant Todd Schmaderer. Todd Schmaderer has a sufficiently senior role such that his decisions may fairly be said to represent the official policy of the City of Omaha.

179.     On October 7, 2020, Officer Liebe emailed her superiors requesting instructions on handling Miller's allegations. She explained that Dr. Stark was a witness for the State and that Miller was a character witness for Anders, the suspect. Officer Liebe called this a "new twist for me as far as witness tampering goes."

180.     On October 20, 2020, Yanez wrote that based on his experience, he was not the appropriate person to investigate Miller's claims, and the Captain of the Criminal Investigation Section agreed with him.

181.     Following the official written policy of the OPD, which permits the assignment of investigations to inappropriate personnel "when particular circumstances dictate," the OPD Captain ordered Yanez to spearhead the investigation anyway. This official policy directly caused a violation of Dr. Stark's Constitutional rights.

182.     On Monday, October 26th, Miller met with Yanez at the Omaha Police Department and gave an interview detailing his false complaints against Dr. Stark.

183.    Miller admitted to Yanez that he gave his original statement to Officer Eischeid while at Anders' Attorney's office.

184.    Miller lied when he told Yanez he was "on every single board" at the University of Nebraska and that he and Dr. Stark had "just a very close relationship" when he was only on one board and hardly knew Dr. Stark at all.

185.    Miller lied to Yanez when he told him that Dr. Stark got him into Creighton because he introduced him to a former Athletic Director for Creighton. Therefore, according to Miller, Dr. Stark could hurt him at Creighton. Miller, however, introduced himself to the former Athletic Director, and Dr. Stark merely wrote him a recommendation letter.

186.    Miller admitted to Yanez that he had a felony and several misdemeanors.

187.    Miller admitted to Yanez that when he received the August 13th text message from Dr. Stark, he had not been subpoenaed and did not feel threatened by the text message because there was no threat in the text message.

188.    During the October 26th interview, Yanez doubted Miller's story and explained:

• "This is kind of a unique situation for me because of the way this whole thing is set up."

• "the dynamic of this whole sexual assault investigation is different than what I'm used to dealing with."

• "a traditional witness tampering case would be like . . . say you are a key witness to [an] assault . . . you are a key witness to that case and the suspect, or someone – lets call him the suspect – the suspect calls you directly and says hey man, if you show up and you testify against me, I'm going to do whatever, whatever. That is your traditional witness tampering case."

• "You're a character witness – you weren't even involved in the investigation."

• "You weren't interviewed."

• "It may or may not fall under witness tampering."

25

- "I've never been involved with something like this."

- "It's not the crime of the century. Nobody died, you know what I mean?"

- "Whether it is true or not, I don't know, right? Only the people who know are the people involved."

- "it's hard to prove intent unless someone involved can say that . . . It's tough."

- "I have never dealt with this. I've been a cop for 22 years and I've never dealt with anything even close to this."

- "It's usually just some dude's shot a dude and they don't want someone to testify against that dude because that guy is going to go to jail for a long time. That's a simple clear-cut witness tampering."

- Witness tampering is "messing with the victim."

- "In the big scheme of things, you know, I mean because you are not directly involved in this case and the information you provide isn't in my opinion very significant to the case."

- "You're only going to talk about a year or two and that a 6-year history right there that you were not a part of."

189.   Miller doubled down and insisted that he was a key fact witness in the Anders case, who was there and "saw everything, was there for like a couple of years every day." Miller tells Yanez he was at the gym 24/7.

190.   Yanez challenged Miller on his claim and asked if he could speak to any events between Anders the Sexual Assault Victim between 2015-2018.

191.   Miller admitted to Yanez that he was on 80mg of oxy a day and abusing alcohol while supposedly witnessing critical facts in the Anders case.

192.   Miller admitted to Yanez that he "loves" the criminal defendant Anders.

193.   Miller admitted to Yanez that Dr. Stark could not hurt him at Creighton and that his position at Creighton was safe.

194.   Miller admitted to Yanez that he had been struggling in school and that tests were approaching that he had been unprepared to take.

195.   Miller accused Dr. Stark of contacting a former High School acquaintance to undermine Miller's relationship with his daughter. This assertion directly conflicted with Miller's allegation that the threat was actually about his professional life at Creighton and future employment in nursing.

196.   Miller admitted to Yanez that he had been talking to Detective Liebe, trying "forever" to get ahold of someone at the police department

197.   Yanez told Miller he would need to interview his ex-wife, Barbara Miller, and the former High School acquaintance, but Yanez never interviewed either.

198.   During the interview, Yanez makes remarks that show he lost his ability to objectively evaluate the evidence. Instead, he took. Miller's side and the two agreed Dr. Stark should be arrested despite the obvious and available evidence to the contrary.

199.   During the October 26th interview, Yanez told Miller:

- "it's pretty horrific in my opinion."

- "the allegations and the investigation, it's severe."

- "I can certainly see how you can jump to that conclusion because that's what it looks like."

- "The simple threat in itself could be all that we need and the conversation between him and [Anders' Attorney]."

- "it is definitely going to be brought up in the investigation. It is definitely going to be brought up in Court."

- "I will call you and tell you so you know. You are going to be in the loop."

- "You are going to know exactly what's going to happen once I get ahold of the prosecutor and share with them what you shared with me."

- "my patience is running thin . . . I'm probably going to visit [the prosecutor] at her office and figure out what to do with this because it's pretty important, pretty significant."

- "I will definitely have an answer for you by the end of the week that I can pretty much guarantee you because if I have to go to [the prosecutor's] boss, then I will."

- "We can't be playing around with this kind of stuff."

- "Time is of the essence for sure so I definitely will make all reasonable efforts that I can to get this thing resolved."

- "it's not looking good for Jack."

- "it looks bad. It looks very bad."

- "He didn't contact nobody but you? That's – I'll say it even though I'm being recorded, but that shitty."

- " So I mean he's kind of a fool to even have contacted you.

200.   During the October 26th interview, Miller provided Yanez with a copy of the August 13th text message from Dr. Stark, Miller's email to the Creighton administration, and Miller's complaint to the Nebraska DHHS. Miller did not provide Yanez with DHHS's letter stating he had insufficient evidence of any wrongdoing.

201.   Yanez never asked how the DHHS responded.

202.   On Friday, October 30, 2020, Yanez had a complete copy of Miller's cell phone downloaded by the Omaha Police Digital Forensics Unit.

203.   The copy of Miller's phone was saved in a Cellebrite file.

204.   Cellebrite files are word-searchable, so it is easy to find evidence.

205.   Standard procedures of criminal investigations dictate that the police should search cell phone data in their possession for relevant evidence.

206.   Yanez never looked at the Cellebrite data or text messages between Anders and Miller.

207.   Had Yanez looked at the text messages, he would have known that it was Anders and Miller who were engaged in witness tampering and not Dr. Stark.

28

208.   Yanez did not continue his investigation of Miller's false claims until after the conclusion of the Anders trial in February 2021.

**L.    Yanez engaged in an unconstitutionally insufficient investigation, maliciously prosecuted Dr. Stark, and filed a materially false affidavit in reckless disregard of the truth.**

209.   In Nebraska, pursuant to Neb. Rev. Stat. § 28-919, a person commits witness tampering when:

> believing that an official proceeding or investigation of a criminal or civil matter is pending or about to be instituted, he or she attempts to induce or otherwise cause a witness or informant to:
>
> (a) Testify or inform falsely;
>
> (b) Withhold any testimony, information, document, or thing;
>
> (c) Elude legal process summoning him or her to testify or supply evidence; or
>
> (d) Absent himself or herself from any proceeding or investigation to which he or she has been legally summoned

210.   In this case, the underlying official proceeding occurred in February 2021.

211.   The most damning evidence presented at trial was over 10,000 text messages between Anders his Sexual Assault Victim, which documented Anders' grooming and exploitation of the Sexual Assault Victim.

212.   During the Anders trial, both Anders and Miller testified.

213.   Miller testified that he went to Millard West High School when he actually went to Bellevue West High School.

214.   Miller testified that he was in the Anders gym every single day, all day long.

215.   Miller testified that he knew and loved the Sexual Assault Victim. He testified that he and the Sexual Assault Victim were like brother and sister. The Sexual Assault Victim has testified that she kept her distance from Miller and thought he was creepy.

216.   Miller testified that the Sexual Assault Victim was alienated when she started at the Gym and become more outgoing as she spent more time there, when in fact she had been outgoing and bubbly at the beginning and turned into a recluse the more time she spent at the gym.

217.   Miller testified that sexual acts never occurred between the Sexual Assault Victim and Anders. Miller testified it would have been impossible for Anders to have sexually assaulted her at the gym:

```
12        Q.   Are you aware, or -- of any acts like that
13   occurring while you were in the gym, that is, the old
14   gym, during the time you were there?
15        A.   Absolutely not.  You know, I can go into it
16   about that, but, yes, absolutely not.  That never
17   occurred.
18        Q.   You say it never occurred?
19        A.   That's what I believe, yes.
20        Q.   How do you know it never occurred?
21        A.   Well, because my big thing is I know people.
22   I majored in communication studies where I focus in
23   and I can read nonverbals.  I can read all that.
24   What I noticed and I observed being there every
25   single day was that she went from a person who felt
```

```
MILLER - Direct ███████████                        575

 1    alienated, excluded from those girls, withdrawn, to
 2    coming to life, to being excited about being there
 3    every day, working out every single day, to the fact
 4    that she would -- there's a guy, I don't remember his
 5    name, but he was a young, hockey kind of player in
 6    medical school.  She'd flirt with him every single
 7    day on the floor while he was there.  So, also, this
 8    gym is wide open and there's glass on the very front
 9    so you can see the vehicles.  So, there's no way
10    anybody can just disappear, or if they disappeared,
11    you'd notice that.  And, so, yeah, that's why I can
12    say that, no, it did not happen.                    ¶
```

218.   The prosecutor impeached Miller and forced him to admit that he was not actually at the gym 24/7.

219.   Miller also testified that erotic and sexually charged text messages between Anders and the Sexual Assault Victim were "coach and athlete talk."

220.   Miller testified that it was normal for coaches to tell their athletes, "I need some."

221.   Miller testified that "after you banged me" might mean "after you worked me out hard."

222.   Through impeachment, the prosecutor demonstrated that Miller lacked any credibility.

223.   The trier of fact in the Anders trial found Miller not credible.

224.   Yanez did not attend the Anders trial despite knowing that all the witnesses relevant to his investigation would be testifying under oath.

225.   Had Yanez attended the trial, he would have known Miller had no credibility.

226.   Had Yanez attended the trial, he would have known how Anders' text messages documented his criminal behavior.

227.   While Yanez was absent, Anders was found guilty of sexual assault in the first degree on February 23, 2021.

**M.   After the conclusion of the Anders trial, Yanez continued his unconstitutional investigation.**

228.   On March 16, 2021, Yanez continued his unconstitutionally insufficient investigation into Miller's false accusations against Dr. Stark once he knew that the Anders sexual assault case was complete.

229.   Yanez ignored the fact that Anders had been found guilty despite Miller's testimony because the court found Miller unbelievable.

230.   Yanez never read the trial transcript despite knowing that Miller, Anders, and the Sexual Assault Victim all testified under oath, and Dr. Stark was not called to testify.

231.   Had Yanez read the transcript, he would have known that Anders and Miller both offered non-credible testimony.

232.   On March 31, 2021, Yanez interviewed Anders' Attorney at his law office.

233.   Anders' Attorney told Yanez that "the prosecution has always had Dr. Stark as a prime witness." Yanez ignored the fact that only a defendant would benefit from the arrest of one of the prosecution's prime witnesses.

234.   Anders' Attorney admitted to Yanez that Miller had a dark past and that Anders had taken Miller under his wing and rehabbed him, "gave him a place to be" thus explaining why Miller would help Anders.

235.   Anders' Attorney admitted that Dr. Stark was never called as a witness in the Anders trial.

236.   Anders' Attorney told Yanez that he never confronted Dr. Stark about Miller's accusations despite having told Officer Eischeid that he called Dr. Stark on August 18, 2020. Yanez willfully ignored this critical discrepancy despite previously telling Miller that Anders' Attorney's August 18th phone call was essential to the case.

237.   Anders' Attorney told Yanez that Miller testified in the trial on behalf of Anders, and Yanez recklessly disregarded the fact that Miller had a motive to lie to support Anders.

238.   Yanez told Anders' Attorney that he planned on getting a copy of Miller's testimony from the Anders trial, but he never did.

239.   On April 13, 2021, Yanez interviewed the prosecuting attorney and confirmed that Miller testified on behalf of Anders and that Dr. Stark never testified for the prosecution. Yanez recklessly ignored the fact that Miller and Anders were successful in witness tampering with Dr. Stark.

240.   On April 16, 2021, Yanez interviewed an administrator at Creighton. The administrator told him that he had called the Dean of the Nursing program on Miller's behalf to get Miller into the Creighton Nursing Program. The administrator told Yanez that the former Athletic Director had nothing to do with Miller getting accepted into the nursing program.

241.   Yanez ignored these facts that directly contradicted Miller's insistence that Dr. Stark got him into Creighton by introducing him to the former Athletic Director and thus had the power to hurt him there.

**N.    Yanez willfully ignored exculpatory evidence despite his knowledge of and experience using cell phone data to investigate crimes.**

242.   The OPD maintains a written official policy regarding the filing of applications for Warrants established by Todd Schmaderer.

243.   On May 18, 2021, Yanez filed an affidavit supporting a search warrant for Dr. Stark's phone records. Yanez swore in his affidavit:

•    "Cell phones are used for communication, access to information, socialization, research, entertainment, shopping, and other functionality. In addition, to personal use, cell phones are often used as tools in criminal activity. Affiant Officer is aware of numerous instances where cell phones were used by participants in crimes to communicate via voice and text messaging."

•    "Communication records from SMS and MMS messaging, email, and internet usage can provide insight to establish an individual's level of culpability

33

and knowledge regarding an investigated incident. It is not uncommon for users to send and receive dozens of messages a day which document a person's activities and can aid in completing the investigation."

244.   Despite knowing the ability of text messages and phone records to document criminal activity, Yanez willfully and recklessly refused to perform even a cursory search of Miller's extensive messaging records with Anders and others.

245.   Yanez never once attempted to interview Dr. Stark despite knowing only two parties – Miller and Stark – participated in the August 14, 2020, phone call.

246.   Yanez's failure to attempt to interview Dr. Stark was a gross violation of standard investigatory procedures in he-said-he-said cases.

247.   Yanez only interviewed three "witnesses" in his entire investigation of the alleged witness tampering. Those three "witnesses" were provided to him by Miller, and none of them had any first-hand knowledge of the August 14th phone call. In fact, all three witnesses provided exculpatory information that undermined Miller's allegations.

248.   Yanez failed to perform an independent investigation and simply took Miller at his word despite the obvious and overwhelming evidence to the contrary.

249.   Yanez recklessly disregarded the fact that witness tampering is typically a crime committed by the defendant in a criminal case. He willfully ignored the fact that the witness who did *not* testify in the Anders trial was the one who was prepared to testify *against* the defendant and for the Sexual Assault Victim.

250.   Yanez knew there was a high degree of probability that Miller's statements were false, and he ignored that fact.

251.   Yanez ignored all the obvious reasons to doubt Miller's false claims, and it was reckless for Yanez to accept Miller's lies as true.

252.   After filing a subpoena on May 18, 2021 for Dr. Stark's phone records, Yanez did not engage in any subsequent investigation of Miller's false allegations.

34

For three months, neither Yanez nor the OPD took any steps to further investigate the alleged witness tampering.

253.   On Wednesday, August 18, 2021, Yanez began drafting and revising his affidavit in support of arresting Dr. Stark on the false witness tampering charge.

254.   The written official OPD policy regarding applications for an arrest warrant directs officers to document "only the minimal amount of information or case facts necessary," which encourages OPD officers to file affidavits that are insufficient to establish probable cause and led directly to the violation of Dr. Stark's Constitutional rights.

255.   On August 24, 2021, Yanez forwarded his affidavit to OPD Lt. Jeremy Christensen.

256.   Following OPD policies and procedures, Lt. Jeremy Christensen gave Yanez final approval to file the affidavit, receive the arrest warrant, and arrest Dr. Stark.

257.   No reasonable police officer or supervising lieutenant could rationally believe Yanez's affidavit established requisite probable cause for a crime.

258.   On August 25, 2021, Yanez filed an affidavit in support of the arrest of Dr. Stark. In the affidavit, Yanez makes multiple materially false statements and omissions:

   a.   Yanez omitted the fact that the underlying criminal proceeding (the Anders trial) had occurred without any obstruction of justice a full six months prior to filing his affidavit.

   b.   Yanez referred to Anders as a suspect six months *after* he had been found guilty of sexual assault in the first degree.

   c.   Yanez omitted the fact that Miller falsely testified that the sexual assault never happened and could not have possibly happened.

   d.   Yanez omitted the fact that the Court found Miller's testimony resoundingly not credible, and Anders was convicted regardless.

35

e. Yanez omitted the fact that Miller exchanged hundreds of messages with Anders wherein Anders directed him on how to get Dr. Stark arrested prior to his trial.

f. Yanez omitted the fact that Miller had conspired with numerous other individuals to extensively campaign the police to arrest Dr. Stark before Anders' trial.

g. Yanez omitted the fact that Miller had every reason to lie on Anders behalf because Anders had "taken him under his wing" and Miller "loved" him.

h. Yanez omitted the fact that Miller first spoke to the police about these allegations while with Anders' Attorney at Anders' Attorney's office while Anders' Attorney was actively defending Anders.

i. Yanez omitted the fact that Dr. Stark never testified against Anders despite being a "prime witness" for the prosecution.

j. Yanez recklessly repeated Miller's false allegations in his affidavit despite having serious doubts about the truth of the statements and despite the mass of evidence demonstrating their falsity.

k. Yanez omitted the fact that Miller got basic facts about the phone call wrong in his various reports to the police.

l. Yanez omitted the fact that Miller has an extensive criminal history and a history of mental illness and drug abuse.

m. Yanez omitted the fact that Dr. Stark has no criminal history of any sort.

n. Yanez omitted the fact that Miller admitted he was absent during material years at issue, but insisted he remained an essential fact witness.

o. Yanez omitted the fact that Miller's alleged evidence of Dr. Stark's retaliation both pre-dated Miller's testimony at trial and conflicted with his shifting recollection of the alleged threat.

36

    p.  Yanez omitted the fact that Miller testified at the trial after claiming to have been terrified of what Dr. Stark could do to him.

    q.  Yanez omitted the fact that Miller suffered no retaliation from Dr. Stark in the six months between his testimony at the Anders trial and Dr. Stark's false arrest.

    r.  Yanez omitted the fact that Anders' Attorney's allegedly corroborating interviews contained material discrepancies about whether he even spoke to Dr. Stark at all.

    s.  Yanez omitted the fact that the prosecution chose not to call Dr. Stark to testify against Anders because of Miller's continuous campaigning.

    t.  Yanez omitted the fact that witness tampering statutes are designed to deter criminal defendants from obstructing justice by tampering with their criminal trials.

    u.  Yanez omitted the fact that Dr. Stark had no motive for threatening Miller as Miller had been Dr. Stark's mentee and was a mere character witness who posed no danger to the criminal defendant.

    v.  Yanez omitted any allegation that the purported crime occurred in Douglas County Nebraska.

    w.  Yanez omitted the statute and sub-part he was alleging had been violated.

    x.  Yanez omitted that Miller was not under subpoena or court order to appear as a witness at the Anders trial at the time Miller and Dr. Stark had their conversation on August 14th.

259.  Yanez erroneously asserted there was reasonable cause to believe Dr. Stark committed the crime of witness tampering despite the totality of the circumstances indicating otherwise.

260.  By the time Yanez filed his affidavit, the exculpatory evidence contained in Miller's cell phone had been in his possession for nearly ten (10) months.

261.   Yanez's affidavit failed to establish probable cause that a crime had been committed and that Dr. Stark had committed a crime. An arrest warrant was issued, nonetheless.

**O.   Dr. Stark was falsely arrested and denied necessary medical care while in custody.**

262.   Shortly after noon, on August 25, 2021, Yanez sent two OPD Officers to arrest Dr. Stark at his home.

263.   Dr. Stark, in shock, told them he felt like he was having a heart attack.

264.   Dr. Stark was visibly shaking.

265.   Dr. Stark took his heart medication before being handcuffed and told the officers that he took his medicines throughout the day. The officers did not allow Dr. Stark to bring any medication with him.

266.   Dr. Stark was in police custody for approximately nine hours.

267.   Dr. Stark informed Yanez that he needed his heart medication.

268.   Yanez and the OPD refused to allow Dr. Stark to obtain the medical treatment he needed for his heart.

269.   While in police custody, Dr. Stark's heart went into atrial fibrillation, and it has not recovered since.

270.   Dr. Stark is now at a much greater risk of suffering a stroke or heart attack than before his arrest.

271.   After Dr. Stark's arrest, there was substantial news coverage of his criminal proceedings which significantly damaged his reputation in the community.

272.   Dr. Stark has since been the victim of vicious public shaming.

273.   Dr. Stark has not had a single consulting job in the Omaha metropolitan area since his false arrest.

**P.   At the preliminary hearing on the charge against Dr. Stark, Yanez admitted his failures and doubts about the case.**

274.   On October 19, 2021, a preliminary hearing was held in Douglas County Court. As of that date, the State of Nebraska had not disclosed the exculpatory evidence on Miller's cell phone to the defense.

275.   Even so, Yanez admitted it was strange for a defendant's witness to call the police from the defendant's attorney's office. He admitted he had never seen such a thing in his 23 years of law enforcement experience.

276.   Yanez admitted that the only written record in the case is the August 13th text message telling Miller to "do what you want."

277.   Yanez admitted that Miller's insistence that he was a fact witness directly conflicted with the truth that he was a character witness.

278.   Yanez admitted he had questions, and therefore doubts, when Miller insisted he was a fact witness rather than a character witness.

279.   Yanez admitted that he had questions, and therefore doubts, when Miller began pleading his case to have Yanez pressure the prosecutor into arresting Dr. Stark just a few days before the Anders trial was set to begin.

280.   Yanez admitted that there was no threat in the August 13th text message, yet he quotes it twice in his affidavit supporting Dr. Stark's arrest.

281.   Yanez admitted that the public policy behind the witness tampering statute is to prevent and penalize criminal defendants from tampering with the prosecution's witnesses and not the other way around.

282.   Yanez admitted that the defendant or someone associated with the defendant typically commits witness tampering.

283.   Yanez also admitted that because Miller was a character witness, Dr. Stark could not have known what he would say during his testimony. Without knowing what a witness will testify to, it is impossible to form the criminal intent necessary to unlawfully attempt to prevent them from testifying.

284.   Yanez admitted he never looked at the trial testimony and did not know that Miller had testified falsely.

**Q.   Dr. Stark was vindicated at trial.**

285.   On January 17, 2023, Dr. Stark was tried before a Douglas County, Nebraska jury on one charge of witness tampering.

286.   Because Yanez never attempted to interview Dr. Stark before his arrest, the first time Dr. Stark ever had the opportunity to tell his side of the story

regarding the August 14, 2020, phone call was over three years later—during his trial on Friday, January 20, 2023.

287.   After hearing Dr. Stark's motion for a directed verdict at the close of evidence, the Douglas County District Judge chastised the State of Nebraska for prosecuting this case to trial. The Judge noted that during closing arguments, the prosecutor would have to tell the jury to believe Miller beyond a reasonable doubt. Then, the Judge read a portion of Miller's false testimony from the *State v. Anders* trial into the record.

288.   The jury returned a verdict of not guilty after just 27 minutes of deliberations.

**FIRST CAUSE OF ACTION:**

**FOURTEENTH AMENDMENT § 1983 CLAIM**

**FOR INADEQUATE INVESTIGATION**

289.   Dr. Stark hereby incorporates the foregoing paragraphs as if fully set forth again.

290.   At all material times, Yanez acted under the color of state law.

291.   At all material times, Yanez acted in his capacity as a police officer at the Omaha Police Department.

292.   Yanez initiated his insufficient investigation at the direction of his superior officers at the Omaha Police Department, including but not limited to Captain Steve Cerveny and Police Chief Todd Schmaderer.

293.   Neither Yanez nor Captain Cerveny believed Yanez was the right officer to investigate Miller's complaints, but they decided he should do so anyway.

294.   The City of Omaha is responsible for the actions of its agents and staff, including police officers, under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

295.   At all material times, the City of Omaha maintains official written policies for felony investigations, the assignment of investigating officers, and the filing of affidavits for arrest warrants.

296.   At all material times, Yanez acted in accordance with the customs, procedures, and official policies of the City of Omaha.

297.   At all material times, the City of Omaha maintained inadequate customs, procedures, policies, and systems to review its agents and police officers, leading directly to the violations of Dr. Stark's constitutional rights. These inadequate policies and procedures were established and approved by Defendant Todd Schmaderer.

298.   Miller acted under the color of state law because he conspired and acted in concert with Yanez to cause Dr. Stark's arrest. Without Miller's lies and constant campaigning, and Yanez's willful failure to perform an independent investigation, Dr. Stark would not have been maliciously prosecuted. *See W.-Anderson v. Mo. Gaming Co.*, 557 F. App'x 620, 623 (8th Cir. 2014).

299.   Yanez intentionally and willfully ignored all the evidence in Miller's phone that proved the existence of a conspiracy to get Dr. Stark arrested and excluded from the Anders trial, despite having it in his possession for ten months.

300.   Yanez knew or should have known that Miller was acting on behalf of the by-then-twice-convicted felon Anders and recklessly refused to investigate Miller's phone records even when he knew that phones and text messages evince criminal activity.

301.   Yanez intentionally and/or recklessly ignored all the evidence suggesting Miller was lying on Anders's behalf, including but not limited to the following:

  a.   The fact that Miller first raised this complaint while in the presence of Anders' Attorney, at Anders' Attorney's office, while Anders' Attorney was actively defending Anders.

  b.   The fact that Miller was a witness for the criminal defendant.

  c.   The fact that Miller was indebted to the criminal defendant for "taking him under his wing" and "giving him a place to be."

  d.   The fact that Miller "loved" the defendant.

41

e. The fact that Miller admitted he was absent during material years at issue, but insisted he remained an essential fact witness.

f. The fact that Miller was personally campaigning the Omaha Police Department to arrest Dr. Stark in the weeks leading up to Anders' trial date.

g. The fact that Miller was a convicted felon testifying on behalf of another felon who was a convicted liar.

h. The fact that Miller's allegations changed over time.

i. The fact that Miller testified at the trial after claiming to have been terrified of what Dr. Stark could do to him.

j. The fact that Miller's testimony at the Anders trial was substantively impeached and disregarded by the trier of fact.

k. The fact that Miller suffered no retaliation from Dr. Stark in the six months between his testimony at the Anders trial and Dr. Stark's false arrest.

l. The fact that Anders' Attorney's allegedly corroborating interviews contained material discrepancies.

m. The fact that the prosecution chose not to call Dr. Stark to testify against Anders because of Miller's continuous campaigning.

n. The fact that witness tampering statutes are designed to deter criminal defendants from obstructing justice by tampering with their criminal trials.

o. The fact that Dr. Stark had no motive for threatening Miller as Miller had been Dr. Stark's mentee and was a mere character witness who posed no danger to the criminal defendant.

302. Yanez purposefully ignored these and other material facts because he personally invested himself in prosecuting this case after deciding that Dr. Stark was "shitty" for talking to Miller.

303.   Yanez was under systematic pressure from Miller, Anders' Attorney, the City Councilman's office, and others still unknown, to charge Dr. Stark with witness tampering in the face of contrary evidence.

304.   Yanez intentionally and willfully refused to interview individuals whom he knew had exculpatory information.

305.   The inadequacy of Yanez's investigation shocks the conscience.

306.   Yanez's gross departure from standard investigatory procedures, in failing to look at Miller's phone data and failing to attend or read the trial testimony from *State v. Anders*,  shocks the conscience.

307.   Yanez knew that Miller, Anders, the Sexual Assault Victim, and Stark were all scheduled to testify under oath regarding critical facts of his investigation. He failed to watch the trial. And he wantonly refused to read the trial transcript.

308.   Dr. Stark had a Constitutional right to a full and independent investigation of any criminal complaints levied against him.

309.   Any reasonable person in Yanez's position, and Yanez himself, knew that a criminal suspect had a Constitutional right to a full and independent investigation of any complaints levied against them.

310.   Yanez, Miller, John or Jane Does 1-5, Schmaderer, and the City of Omaha are liable to Dr. Stark under § 1983 for inadequate investigation in violation of his Fourteenth Amendment right to due process of law.

## SECOND CAUSE OF ACTION
## FOURTH AMENDMENT § 1983 CLAIM FOR
## FRAUDULENTLY OBTAINED ARREST WARRANT

311.   Dr. Stark hereby incorporates the foregoing paragraphs as if fully set forth again.

312.   The Fourth Amendment applies to the States through the Fourteenth Amendment.

313.   "A warrant based upon an affidavit containing deliberate falsehood or reckless disregard for the truth violates the fourth amendment and subjects the

police officer to § 1983 liability." *Morris v. Lanpher*, 563 F.3d 399, 402 (8th Cir. 2009).

314.   Yanez filed his affidavit in support of an arrest warrant for Dr. Stark on August 25, 2021, after sending it to his supervisor for approval.

315.   Yanez followed Omaha Police Department Policy on warrant affidavits in attempting to document "only the minimal amount of information or case facts needed to establish probable cause."

316.   Yanez's affidavit failed to establish probable cause.

317.   Yanez's affidavit is a "bare bones" affidavit that did not present sufficient evidence for an impartial magistrate to determine probable cause.

318.   The affidavit is less than two pages long, quotes the August 13th text message twice, contains just three sentences restating Miller's alleged threats, contains no reference to which provision of the Nebraska witness tampering statute was allegedly violated, contains no allegations that said acts occurred in Douglas County, Nebraska, and is completely devoid of any corroborating evidence that Miller's accusations were true.

319.   Nothing in Yanez's affidavit suggests that Dr. Stark had any ability to follow through on the alleged threats to "ruin" Miller.

320.   Nothing in Yanez's affidavit suggests any motive for Dr. Stark to threaten Miller.

321.   Nothing in Yanez's affidavit suggests that Dr. Stark had the required specific intent to obstruct justice.

322.   Nothing in Yanez's affidavit suggests that Dr. Stark had the subjective intent to convey a threat of imminent harm sufficient to remove his speech from the protections of the First Amendment.

323.   Yanez's affidavit failed to present the totality of the circumstances in a manner that would allow a neutral magistrate to use common sense in assessing the existence of probable cause that both a crime had been committed and that Dr. Stark had committed the crime.

324.   Yanez's affidavit seeking Dr. Stark's arrest contained materially false statements of fact and omitted material facts such that it was fundamentally misleading.

325.   Yanez's affidavit intentionally misrepresented the facts of this case, and Yanez recklessly disregarded the truth in making his statements. Specifically, Yanez's affidavit consisted of materially misleading statements and or omissions, including but not limited to those listed above in paragraph #258.

326.   Yanez knew that Miller's allegations were false as he had already informed Miller that prosecution witnesses do not tamper with character witnesses for the defense, but rather, it is defendants who tamper with witnesses for the prosecution.

327.   Yanez's affidavit alleges that Dr. Stark told Miller not to show up to testify for Anders. Even if that were true, telling someone not to show up is not a violation of the Nebraska witness tampering statute unless the witness was under subpoena. Miller had not been subpoenaed when he and Dr. Stark spoke on August 14th.

328.   Yanez's affidavit does not allege that Dr. Stark told Miller to withhold any testimony; rather, it alleges he told Miller not to show up. Telling someone to absent themselves is not telling them to withhold testimony.

329.   Miller was a mere character witness; he had no material testimony to withhold.

330.   Yanez knew that if he had included all of the exculpatory evidence in his affidavit, the judge would not have found probable cause and would not have issued the warrant for Dr. Stark's arrest.

331.   Yanez knew that if he had included the text or a citation to the Nebraska witness tampering statute in his affidavit, the judge would not have found probable cause and would not have issued the warrant for Dr. Stark's arrest.

332.   Yanez's misrepresentations and omissions were made intentionally or in reckless disregard of the truth and undermined the County Court's ability to

engage in the required practical commonsense evaluation of the totality of the circumstances.

333.   Yanez knew that his affidavit was a sworn statement filed under oath and the penalty of perjury.

334.   Dr. Stark had a Constitutional right to be free from unreasonable searches and seizures under the Fourth Amendment. That right includes the right not to be arrested on a warrant obtained fraudulently or with reckless disregard for the truth.

335.   Any reasonable person in Yanez's position, and Yanez himself, knew that all Americans have the Constitutional right to be free from unreasonable seizures.

336.   Yanez, Miller, John or Jane Does 1-5, Schmaderer, and the City of Omaha are liable to Dr. Stark under § 1983 for fraudulently obtaining an arrest warrant for Dr. Stark in violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

## THIRD CAUSE OF ACTION:
## FOURTH AMENDMENT § 1983 CLAIM FOR FALSE ARREST

337.   Dr. Stark hereby incorporates the foregoing paragraphs as if fully set forth again.

338.   The Fourth Amendment of the Constitution guarantees all Americans the right to be free from unreasonable searches and seizures.

339.   With the approval of his superiors at the Omaha Police Department, Yanez authored and filed the affidavit which purported to establish probable cause to arrest Dr. Stark.

340.   Yanez knew the affidavit did not establish probable cause on its face.

341.   The information filed in his criminal case alleged that Dr. Stark, on or about August 14, 2020, "did, believing that an official proceeding or investigation of a criminal matter was pending or about to be instituted, attempt to induce or otherwise cause a witness or informant to (1) testify or inform falsely; (2) withhold

any testimony, information, document, or thing; (3) elude legal process summoning him or her to testify or supply evidence; or (4) absent himself or herself from any proceeding or investigation to which he or she had been legally summoned."

342.   Yanez knew that Dr. Stark did not attempt to induce Miller to testify falsely.

343.   Yanez knew that Dr. Stark did not attempt to induce Miller to elude legal process.

344.   Yanez knew that Dr. Stark did not attempt to induce Miller to absent himself from any proceeding to which he had been summoned. Miller had not been subpoenaed.

345.   Yanez knew that Dr. Stark did not attempt to induce Miller to withhold any testimony, information, document, or thing because Yanez had already told Miller that he had no relevant information to the Anders case.

346.   Yanez knew that his allegation that Dr. Stark told Miller not to show up meant "absent himself" and not "withhold any testimony."

347.   Yanez knew he did not allege that any supposedly criminal acts occurred in Douglas County, Nebraska.

348.   Yanez knew that his affidavit did not establish that any one of the four means of witness tampering had occurred.

349.   Yanez knew that his affidavit did not allege which prong of the witness tampering statute Dr. Stark had supposedly violated. His affidavit did not even allege the statute at all.

350.   Yanez knew that a character witness for the defendant is not a "witness" as used in Neb. Rev. Stat. § 28-920 because, by Yanez's own admission, Miller had no knowledge of any "relevant fact or occurrence," and that Miller posed no "threat to the accused or a person who is about to be accused." *State v. Cisneros*, 248 Neb. 372, 378, 535 N.W.2d 703, 709 (1995).

351.   Yanez knew the affidavit materially misrepresented the facts of the case, and he knew the weight of the evidence demonstrated Miller's allegations were false.

352. Yanez knew that Dr. Stark had no motive for the alleged tampering.

353. Yanez knew that Miller had every reason to lie and was acting on behalf of a convicted liar.

354. Yanez knew that Dr. Stark had no authority or power to "ruin" Miller.

355. Yanez knew that his affidavit failed to allege any facts whatsoever that suggested Dr. Stark had any specific intent to obstruct justice.

356. Yanez knew he had not performed a thorough and independent investigation and had failed to investigate essential facts he himself said he would investigate.

357. Yanez knew that there was no probable cause to arrest Dr. Stark.

358. Yanez knew the Douglas County Court had insufficient facts to use common sense in assessing the totality of the circumstances and that the arrest warrant issued by the Court was not a reasonable indicator of probable cause.

359. Yanez ordered Detective Dave Preston and a uniformed patrol officer to arrest Dr. Stark despite his knowledge that there was no probable cause.

360. At approximately 12:52 p.m. on Wednesday August 25, 2021, Dr. Stark was arrested without probable cause at him home in Omaha.

361. Dr. Stark was handcuffed and transported to Central Police Headquarters.

362. Dr. Stark was ordered to change into a jailhouse jumpsuit.

363. Dr. Stark's phone was taken from him and searched.

364. Dr. Stark was not released until late in the evening. He was released onto the streets of downtown Omaha, without any means of transportation or communication.

365. The entire time that Dr. Stark was in Omaha Police custody, Yanez knew there was no probable cause.

366. Dr. Stark had a Constitutional right to be free from unreasonable searches and seizures under the Fourth Amendment. That right includes the right not to be arrested without probable cause.

48

367.    Any reasonable person in Yanez's position, and Yanez himself, knew that Dr. Stark had the right to be free from arrests unsupported by probable cause.

368.    Yanez, Miller, John or Jane Does 1-5, Schmaderer, and the City of Omaha are liable to Dr. Stark under § 1983 for falsely arresting Dr. Stark in violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

## FOURTH CAUSE OF ACTION:

## FOURTH AMENDMENT § 1983 CLAIM FOR MALICIOUS PROSECUTION

369.    Dr. Stark hereby incorporates the foregoing paragraphs as if fully set forth again.

370.    "The Supreme Court recently declared that malicious prosecution is actionable under the Fourth Amendment." *Klein v. Steinkamp*, 44 F.4th 1111 (8th Cir. 2022) (citing *Thompson v. Clark* --- U.S. ---, 142 S.Ct. 1332, 1337 (2022)).

371.    Dr. Stark was charged with the crime of witness tampering on the affidavit filed by Yanez.

372.    Yanez did not have probable cause to believe that Dr. Stark committed the crime of witness tampering.

373.    Miller was not a sufficiently trustworthy source of information to induce a person of reasonable caution to believe Dr. Stark committed the crime of witness tampering when all the evidence pointed towards Miller having committed the crime of witness tampering.

374.    Yanez sought to prosecute the case against Dr. Stark because of his sympathies for and in collusion with Miller despite his legitimate and serious doubt about Miller's allegations.

375.    After meeting with Miller, Yanez took personal responsibility for pushing the case forward because he thought what Miller alleged of Dr. Stark was "shitty."

376.    Yanez became emotionally invested after sympathizing with Miller: "just your background alone, your story alone, that makes it ten times worse in my opinion."

377.    Yanez promised Miller that he would ensure his allegations were "resolved" even if he had to go to the prosecutor's boss.

378.    Yanez intentionally prosecuted this case against Dr. Stark without just cause by deliberately ignoring and recklessly disregarding the overwhelming totality of evidence that undermined Miller's account.

379.    Dr. Stark had the right to be free from malicious prosecution under the Fourth Amendment.

380.    While the cause of action to pursue redress for malicious prosecution is relatively new to this Circuit, the common law has long held that Americans have the right to be free from a criminal prosecution unsupported by probable cause.

381.    Any reasonable person in Yanez's position, and Yanez himself, knew that Dr. Stark had the right to be free from a criminal prosecution unsupported by probable cause.

382.    Yanez, Miller, John or Jane Does 1-5, Schmaderer, and the City of Omaha are liable to Dr. Stark under § 1983 for maliciously prosecuting Dr. Stark in violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

## FIFTH CAUSE OF ACTION:
## FOURTH AND FOURTEENTH AMENDMENTS § 1983
## CLAIM FOR CIVIL CONSPIRACY

383.    Dr. Stark hereby incorporates the foregoing paragraphs as if fully set forth again.

384.    Yanez conspired and acted in concert with Miller, his superiors at the Omaha Police Department, the prosecuting attorneys, and other persons still unknown, to deprive Dr. Stark of his constitutional rights under the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures without due process of law.

385.    On October 26, 2020, Yanez and Miller reached an agreement that Dr. Stark should be arrested and charged with witness tampering without regard for the evidence to the contrary.

386.    Yanez specifically promised Miller that he would keep Miller "in the loop" and if the prosecutor did not want to charge Dr. Stark, Yanez promised to "go to her boss."

387.    Yanez promised Miller that he would push to get this "resolved" as quickly as possible.

388.    After the October 26, 2020, interview with Miller, Yanez, in compliance with OPD policy and procedures, ignored the totality of evidence demonstrating Dr. Stark's innocence and overtly acted in furtherance of the conspiracy by filing materially false affidavits and engaging in an inadequate investigation.

389.    By choosing to enact an inadequate investigation, filing materially false affidavits in reckless disregard of the truth, arresting Dr. Stark without probable cause, and maliciously prosecuting Dr. Stark, Yanez took direct actions to violate Dr. Stark's constitutional rights under the Fourth and Fourteenth Amendments.

390.    As a result of Yanez's acts, Dr. Stark was falsely arrested and charged with the crime of witness tampering thus depriving him of his constitutional right to be free from unreasonable searches and seizures.

391.    Dr. Stark suffered monetary and reputational injuries because of these violations of his Constitutional rights.

392.    Dr. Stark had a Constitutional right to be free from conspiracies engaged in efforts to violate his Constitutional rights.

393.    Any reasonable person in Yanez's position, and Yanez himself, knew that Dr. Stark had the right to be free from conspiracies engaged in efforts to violate his Constitutional rights.

394.    Yanez, Miller, John and Jane Does 1-5, Schmaderer, and the City of Omaha are liable to Dr. Stark under § 1983 for civil conspiracy to violate his constitutional rights under the Fourth and Fourteenth Amendments.

## SIXTH CAUSE OF ACTION:
## FIRST AMENDMENT § 1983 CLAIM FOR VIOLATING
## DR. STARK'S RIGHT TO FREE SPEECH

395.   Dr. Stark hereby incorporates the foregoing paragraphs as if fully set forth again.

396.   The First Amendment is applicable to the States through the Fourteenth Amendment.

397.   On August 14, 2020, Dr. Stark had a roughly ten-minute phone call with his mentee Miller.

398.   Dr. Stark gave Miller advice regarding his stress due to getting kicked out of his house, struggles in school, and demands of the upcoming Anders trial.

399.   Because of Miller's lies, Yanez's insufficient investigation and materially false affidavit, Dr. Stark was charged with one count of witness tampering under NEB. REV. STAT § 28-919.

400.   NEB. REV. STAT. § 28-919 is unconstitutionally broad and vague because it proscribes constitutionally protected speech.

401.   Since 1969 it has been clear that "A statute . . . which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." *Watts v. United States*, 394 U.S. 705, 707 (1969).

402.   "Induce" and "otherwise cause" are so broad that they capture speech as benign as carrying a sign on the sidewalk in front of the Courthouse that reads, "Don't testify for rapists," or notifying a friend or family member that testifying on behalf of a rapist risks their reputation as courtroom testimony is public.

403.   Because NEB. REV. STAT. § 28-919 is overbroad and vague on its face, it is unconstitutional under the First Amendment.

404.   NEB. REV. STAT. § 28-919 is also unconstitutional as applied to Dr. Stark.

405.   Dr. Stark did not threaten Miller in any way.

52

406.    Regardless, nothing Miller alleged could be constitutionally prosecuted under Neb. Rev. Stat. § 28-919 because nothing Miller alleged constituted speech beyond the protections of the First Amendment.

407.    "From 1791 to the present, the First Amendment has permitted restrictions upon the content of speech in [only] a few limited areas." *Counterman v. Colorado*, 600 U.S. _____, No.22-138 slip op. at 5 (2023).

408.    Among the historically recognized categories of speech not protected by the First Amendment are:

> (1) "Incitement—statements directed at producing imminent lawless action."
>
> (2) "defamation—false statements of fact harming another's reputation."
>
> (3) "obscenity—valueless material appealing to the prurient interest," and
>
> (4) "True Threats of violence." *Id.*

409.    True Threats are distinct from other speech that does not "convey a real possibility that violence will follow." *Id.* at 6.

410.    "True Threats are serious expressions conveying that a speaker means to commit an act of unlawful violence." Id.

411.    "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Virginia v. Black*, 538 U.S. 343, 360 (2003).

412.    Miller falsely alleged that Dr. Stark told him "I need you to not show up," and proceeded to threaten to make things "difficult" for him at Creighton University and inhibit his employment prospects after he finished school.

413.    Yanez alleges in his affidavit that Miller said Dr. Stark threatened to "ruin Miller."

414.    Miller never alleged that Dr. Stark placed him in fear of harm or death.

415.    Neither Miller nor Yanez alleged that Dr. Stark threatened Miller with any kind of unlawful violence.

416.    Even if Miller had alleged he was *subjectively afraid* of imminent physical harm, nothing in the statement he conveyed to the Police would convince a reasonably objective person that there was a risk of imminent harm.

417.    Additionally, Miller admitted to Yanez that Dr. Stark does not have any power to hurt him at Creighton, which was supposed to be one of the alleged threats. The University of Nebraska Board of Regents is an administrative body that provides strategic leadership to the University of Nebraska by selecting the President and approving the budget. The Board of Regents has no power to make hiring decisions for any position below the University President. The Board of Regents has no authority at all, over any organization, public or private, outside the University of Nebraska system.

418.    It is impossible for a single member of the University Board of Regent to ruin someone professionally. They simply do not have that kind of power.

419.    A threat that is factually impossible to follow through on, cannot be a true threat, which must "convey a real possibility."

420.     While criminal defendants do not have a Constitutional right to obstruct their own criminal proceedings, individually or through an agent like Miller, and are often under Court order not to contact any prosecution witness, Dr. Stark was never under any such order.

421.    None of Miller's allegations fall into any of the categories of unprotected speech. Miller did not allege that Dr. Stark directed Miller to commit a lawless action, defamed Miller, appealed to any prurient interest, or threaten any "unlawful violence."

422.    Yanez's affidavit does not allege any speech that can be criminally prosecuted under the First Amendment.

423.    In order to prosecute a case based on the content of speech, the "First Amendment demands proof of a defendant's mindset." *Counterman*, slip op. at 8.

424.   Yanez and his affidavit are completely devoid of any allegation that Dr. Stark had the mental intent required to support a prosecution for witness tampering.

425.   A threat without any legitimate evidence of intent is not actionable under any criminal statute, because it is protected speech under the First Amendment.

426.   The Government has no compelling or legitimate interest in regulating or criminalizing the content of speech regarding a matter of public concern that occurs between two private citizens, neither of whom is under a subpoena.

427.   Being arrested in retaliation for protected speech is an act that would chill a person of ordinary firmness from continuing in that speech.

428.   Dr. Stark's arrest was directly motivated by his protected speech.

429.   Any reasonable person in Yanez's position, and Yanez himself, knew that Dr. Stark had the right to free speech and knew that nothing Miller alleged constituted unprotected speech.

430.   Yanez, Miller, John and Jane Does 1-5, Schmaderer, and the City of Omaha are liable to Dr. Stark under § 1983 for violating his freedom of speech under the First Amendment.

## SEVENTH CAUSE OF ACTION:

## STATE COMMON LAW CLAIM FOR MALICIOUS PROSECUTION

431.   Dr. Stark hereby incorporates the foregoing paragraphs as if fully set forth again.

432.   In August 2020, the State of Nebraska commenced its case against Dr. Stark with the filing of Yanez's affidavit and a criminal complaint in Douglas County Court.

433.   Defendants Miller, Anders, and John or Jane Does 1-5 actively campaigned OPD, the Douglas County Prosecutor's Office, the Nebraska Attorney General's Office, the Omaha City Council, and others to ensure Dr. Stark was arrested.

434. Yanez would not have interviewed Miller had Miller not been conspiring with Anders and John or Jane Does 1-5 to campaign for Dr. Stark's arrest. The squeaky wheel gets the grease.

435. Yanez's affidavit cites the original false report given by Miller on August 29, 2020, and Miller's later statements to Yanez in October 2020.

436. Without Miller's false statements, the State of Nebraska would not have been able to commence this proceeding against Dr. Stark.

437. Defendants Miller, Anders, and John Does 1-5, individually acted to legally cause the proceeding against Dr. Stark without any probable cause and did, in fact, legally cause the State of Nebraska to commence this proceeding.

438. Miller acted to direct, counsel, and persuade Yanez and the prosecuting attorney to bring this charge against Dr. Stark through consistent badgering, text messages, and persuasion.

439. Miller, at Anders' direction, intentionally provided Yanez and the prosecuting attorneys with false and misleading information with the intention of inducing them to bring this charge against Dr. Stark.

440. John or Jane Does 1-5 acted to induce the police and prosecutors to bring this charge against Dr. Stark by badgering members of an Omaha City Councilman and others with daily phone calls and persuading the Councilman to contact the county prosecutor's office to ensure this charge was initiated.

441. Miller collaborated with his coconspirators on strategies to use the media and the DHHS as means of pressuring the prosecution of Dr. Stark.

442. Miller and his coconspirators acted with malice in their actions to induce the prosecution of Dr. Stark, because they hoped Dr. Stark would then be unable to testify at the Anders trial.

443. Miller had the further hope that in maliciously prosecuting this charge against Dr. Stark he would be more likely to receive a pardon for his felony conviction.

444. Because of the malicious actions of Miller and his coconspirators, Dr. Stark was tried by a jury and ultimately acquitted on January 20, 2023.

445.   In facing these false allegations, Dr. Stark suffered extensive monetary, economic, emotional, mental, and physical damages.

446.   Miller, Anders, and John or Jane Does 1-5 are jointly and severally liable to Dr. Stark for malicious prosecution under Nebraska common law.

## EIGHTH CAUSE OF ACTION
## STATE COMMON LAW CLAIM FOR CIVIL CONSPIRACY

447.   Dr. Stark hereby incorporates the foregoing paragraphs as if fully set forth again.

448.   Miller, Anders, and John or Jane Does 1-5 had an express or implied agreement to maliciously prosecute Dr. Stark.

449.   Miller, Anders, and John or Jane Does 1-5 acted in concert to cause Dr. Stark's prosecution without probable cause.

450.   Miller, Anders, and John or Jane Does 1-5 acted maliciously towards Dr. Stark because they sought to ensure he did not testify at the Anders trial and/or punish Dr. Stark politically.

451.   Miller, Anders, and John or Jane Does 1-5 were successful.

452.   Criminal proceedings were initiated against Dr. Stark because of the conspiratorial acts of Miller, Anders, and John or Jane Does 1-5.

453.    The criminal proceeding against Dr. Stark ended in his favor.

454.   In facing these false allegations, Dr. Stark suffered extensive monetary, economic, emotional, mental, and physical damages.

455.   Miller, Anders, and John or Jane Does 1-5 are vicariously liable for the acts of their co-conspirators in maliciously prosecuting Dr. Stark.

## DAMAGES COMMON TO ALL CAUSES OF ACTION IN PLAINTIFF'S COMPLAINT

456.    Dr. Stark hereby incorporates the foregoing paragraphs as if fully set forth again.

457.   As a direct and proximate cause of the unconstitutional and unlawful actions of Yanez, Miller, John or Jane Does 1-5, Schmaderer, and the City of Omaha, Dr. Stark suffered injuries including but not limited to the following:

a.     Legal defense fees in the amount of at least $308,000;

b.     Past and future lost earnings;

c.     Past and future medical expenses;

d.     Past and future physical and mental pain, suffering, anguish and emotional distress;

e.     Past and future embarrassment, humiliation, inconvenience, and loss of enjoyment of life; and,

f.     Past and future reputational damage to his name and person.

WHEREFORE, Dr. Stark prays this Court enter judgment against the Defendants, jointly and severally, on his First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action for the general and special damages that Dr. Stark has and will continue to sustain; punitive damages as authorized by law; prejudgment and post-judgment interest thereon at the highest legal rate; the costs of this lawsuit; attorneys fees; and such further relief as the Court deems just and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

To the extent a jury trial is permitted by applicable law, Dr. Stark demands a trial by jury on all matters that are triable to jury, and that the trial be held in the United States District Court for the District of Nebraska.

DATED this 13th day of December, 2023.

JACK A. STARK, Defendant

BY:    <u>*/s/ Justin W. Pritchett*</u>
Justin W. Pritchett, #27914
Michael B. Duffy, #27529
Katherine A. McNamara, #25142
FRASER STRYKER PC LLO
500 Energy Plaza
409 South 17th Street
Omaha, NE 68102-2663
(402) 341-6000
jpritchett@fraserstryker.com
mduffy@fraserstryker.com
kmcnamara@fraserstryker.com
ATTORNEYS FOR PLAINTIFF